UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | |
| ) | CRIMINAL ACTION |
| v. ) | NO. 2:12-CR-28-RWS |
| ) | |
| LARRY McDANIEL, ) | |
| ) | |
| Defendant. ) | |

**<u>PRE-HEARING MEMORANDUM
IN SUPPORT OF RELEASE PENDING TRIAL</u>**

Defendant, Larry McDaniel, was arrested on August 12 and charged with one count of obstruction of justice pursuant to 18 U.S.C. § 1505.  The facts underlying this allegation are not seriously in dispute:  McDaniel is the president of the southeast region of the Outlaw Motorcycle Club ("OMC").  He is *not* alleged to have had any involvement in any illicit drug dealing, which is the subject of several other recent indictments in this district against other OMC members.

Sometime in the spring of 2012, McDaniel received information that there was an informant and possibly an undercover law enforcement agent who were members of the OMC, or one of its affiliate clubs, the Black Pistons.  McDaniel received this information, but ignored it initially.  (Preliminary Hearing p. 48, 50).

In mid-July, 2012, however, McDaniel received the same information a second time, this time the information included not only information about an

1

informant, but also identified the FBI case agent who was in charge of the undercover investigation. (Preliminary Hearing p. 38). McDaniel asked two of the OMC club members to go to the Black Pistons clubhouse in Cleveland, Georgia and close the club (Preliminary Hearing p. 34).[1] The two members went into the clubhouse in Cleveland and closed the club, explaining to two club members who were there that the reason the club was being closed was because of the suspicion that there was "a fed in the club" (Preliminary Hearing p. 22, 23). One of the two members who were given this information was, in fact, the confidential informant himself. The two individuals who went to the clubhouse in Cleveland did not threaten any person or indicate that they were aware that there was an undercover investigation that was ongoing. All that was known was that there was an informant in the Black Pistons club. The clubhouse was closed and the Black Pistons who were present were asked to turn in their patches (or vests), which they did without incident.

A day or two later, the confidential informant called McDaniel on the phone (He was directed to call McDaniel by the FBI (Preliminary Hearing p. 29)). The entire conversation was transcribed and is contained in the criminal arrest complaint which is in the record (Doc. #1). McDaniel calmly explained that he had received information that the caller was a confidential informant and he felt

---

[1] Actually, several members of the club went to the Cleveland clubhouse, but only two members went inside. (Preliminary Hearing p. 34).

obligated to investigate this information. McDaniel did not threaten the informant (even conditionally) or suggest or imply in any way whatsoever, that if the information turned out to be true, there would be any consequences.

That is the entire evidence relating to the charge of obstruction of justice. The government alleges (and the recently-returned indictment charges) that McDaniel's conduct obstructed an ongoing FBI undercover operation. Noteworthy, however, are these uncontested facts:

1. There is no information known to the government that McDaniel *knew* that there was an ongoing undercover investigation. All that he knew (or was told by his source) was that there was an informant in the club and that the case agent was Mark Sewell. Whether there was an actual ongoing investigation or any undercover activities that were planned was never specifically revealed to McDaniel.

2. Neither McDaniel, nor his colleagues who went to the clubhouse in Cleveland stated, or suggested that there would be consequences if the information about the informant turned out to be true.

3. The members of the Black Pistons were not told that there was an undercover FBI operation in progress; one member (other than the informant) was simply told that there was information that there was an informant in their midst. Thus, even if McDaniel was somehow aware that

there was an actual undercover operation in progress, there is not a shred of evidence that he revealed this to anybody: not to the people he sent to the clubhouse in Cleveland and not to any other person.

4. McDaniel's conversation with the informant could not possibly have obstructed justice, because the informant knew that he was, in fact, the informant, so McDaniel's conversation with him did not "spill the beans" or otherwise have any effect whatsoever on the FBI's plans (other than to reveal to them the fact that McDaniel had received this information from some source).

5. There is no information concerning the source of McDaniel's information, or whether he engaged in any misconduct whatsoever in obtaining the information (i.e., a payment to the source or a law enforcement officer).

The government's theory is that McDaniel's conduct resulted in the disruption of the undercover operation, including a party that was supposed to occur the next weekend at which the undercover agent was going to attempt to tape record more members of the club. In essence, the government contends that McDaniel, having received information about the informant in the Black Pistons was required to do *nothing*. He could not reveal this information to any other person; he could not take any steps to remove the informant from the club if that resulted in a disclosure of the existence of the undercover operation. *Anything* he did, after receiving

information about the existence of the informant that thwarted the government's effort to continue with the undercover operation would violate 18 U.S.C. § 1505, according to the government.[2]

The FBI decided to arrest McDaniel on August 12, 2012.  McDaniel, at the time, was living at the OMC clubhouse in Atlanta.  He had been living in Savannah for the past two years, but had recently been laid off his job at Diamond Trailer Service, which provides service to the CSX Railway Company (His employer testified at the first bond hearing, verifying these dates and his employment, First Bond Hearing p. 66 – 68).  The Clubhouse property in Atlanta consists of a clubhouse (which has a bar, a porch, a kitchen an office with a bed in it and a bathroom), a parking lot and across from the parking lot an apartment which has a hallway and one bedroom.

---

[2] 18 U.S.C. § 1505 provides, in relevant part:
"Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States  [shall be imprisoned up to five years]."
    The defense does not concede that even if McDaniel did corruptly intend to interfere with an ongoing undercover operation of the FBI that this is a crime under § 1505, because an undercover operation of a law enforcement agency is not a "proceeding" as contemplated by this statute.

The agents went to the clubhouse and arrested McDaniel. They later searched both the clubhouse and the apartment across from the parking lot. In the apartment, a gun was found. No gun was found in the clubhouse where McDaniel was located. Mr. McDaniel did *not* have a key to the apartment when he was arrested and no key to the apartment was found in his belongings, or in the clubhouse where he slept. Though the record is sparse on the subject of what else was found in the two locations, the defense will proffer the following additional facts at the hearing on September 18:

1. McDaniel had slept in the apartment across from the parking lot perhaps one or two times since he moved back to Atlanta in April of 2012 (after being laid off at his job in Savannah. All other nights, he slept in the clubhouse office.[3]

2. The nights he slept in the apartment were when his wife (or perhaps another woman) was visiting (First Bond Hearing p. 23, 27).

3. He kept his change of clothes in the office. He kept his toiletries in the office. He had his blood pressure medicine in the office. His passport, his billfold, his vest, his laptop, his tennis shoes and his boots, his socks, his jeans his razor, his soap dish – all of these personal items were kept in the

---

[3] The agent who testified at the First Bond Hearing did not know how often McDaniel slept in one room or the other, but acknowledged that he slept in the apartment (where the guns was found) when he had a woman with him, but slept the "majority of the time" in the room in the clubhouse (First Bond Hearing p. 30).

office where he resided. He had a television in the office. There was a bathroom next to the office in the clubhouse which he used to bathe and take his medicine.

4. In the apartment where the gun was found, McDaniel had no toiletries, no personal effects, no money, no items of personal interest, no pictures, no medicine, no television, no laptop. There may have been some of his clothes strewn around the apartment, some of which may have been his, but none of which he wore on a regular basis and some of which may have been left there from the couple nights that he slept there weeks or months earlier.

5. Several other people slept in the apartment – particularly when women were visiting – though nobody recently "lived" for any extended time in the apartment.

In addition to these facts, the government attempted to link McDaniel to the gun (or "a" gun) through the double hearsay testimony of the FBI agent, who, at the initial bond hearing testified that an unidentified person told the confidential informant, who told the FBI agent that on a prior occasion, he had given a gun to McDaniel (First Bond Hearing p. 28). However, the government has now revealed that that "unidentified person" testified at the grand jury under oath

that this never occurred and he never told the informant that this occurred.[4] That "supposed" gun – the one that the informant claims that someone else told him was given to McDaniel by that other person – is the *only* gun that the FBI has *any* knowledge that McDaniel has ever possessed (First Bond Hearing p. 31). And now we have learned that the sworn testimony is that McDaniel was not given that gun as claimed by the informant.

The FBI Agent also testified at the initial bond hearing that the informant, who was a member of the Black Pistons for many years, had never seen McDaniel with a gun at any time, nor did the undercover agent who had "infiltrated" the Club (First Bond Hearing p. 28).

In sum, the evidence supporting the charge that McDaniel possessed a firearm on August 12 is far-fetched and borders on being frivolous.

A few other facts are important in connection with the question of bond: First, at the time of McDaniel's arrest, he was fully cooperative (Preliminary Hearing p. 45 - 50). He explained to the arresting agent about the circumstances of his receipt of the information about the informant (*Id*.). Not only did he answer the questions, but he also provided additional information and documents, about which the agents were previously unaware (*Id*.; Preliminary Hearing p. 33, 37). He also provided to the agents the patches and

---

[4] AUSA McKinnon provided this *Brady* information to undersigned counsel in response to a *Brady* request on Wednesday, September 12).

vests that were collected from the Cleveland clubhouse earlier (Preliminary Hearing p. 35).

Second, though McDaniel has had several prior arrests and convictions, he is now 65 years old and his last criminal act was over thirty years ago. He was convicted of a marijuana conspiracy which occurred in the early 1980's. He was a fugitive for nearly twelve years and eventually served three years in prison for that offense in the early 1990's. He successfully completed a period of parole (his conviction was for a pre-Guidelines offense) and has not had any arrests for any offense since that time. To repeat what was said above, he had no involvement in the criminal conduct that led to the indictments of other OMC members that are pending in this District (First Bond Hearing p. 29). This included undercover recordings of McDaniel: The recordings show no involvement of McDaniel in any drug transactions (First Bond Hearing p. 37).

Magistrate Cole granted bond to McDaniel (Second Bond Hearing). Significant conditions of release were included in the release order, all of which were agreed to by McDaniel. The *only* fact not known to Magistrate Cole was the subsequent indictment for the gun offense. Magistrate Cole knew about the gun found in the apartment – this was the subject of testimony at the initial

bond hearing – but the grand jury had not yet returned an indictment for that offense.[5]

## CONCLUSION

Larry McDaniel is entitled to be released on bond pending trial. He has agreed to wear an ankle monitor, to reside in the home of the two people who testified at the bond hearing and will be present on September 18. Both his sister and his wife will sign the bond and pledge their homes.

The defense urges the court to affirm the decision of the Magistrate and to grant McDaniel's release.

Respectfully submitted,

GARLAND, SAMUEL & LOEB, P.C.

_____
DONALD F. SAMUEL
Georgia Bar No. 624475

3151 Maple Drive, N.E.
Atlanta, Georgia 30305
(404) 262-2225

---

[5] Magistrate Cole was also informed that an unidentified person had told the informant who told the FBI agent that the person had given a gun to McDaniel. As noted above, at the subsequent grand jury proceeding, the person testified and denied that this ever occurred. Thus Magistrate Cole actually was under the impression that there was *more* evidence linking McDaniel to the gun than actually exists at this time. The government's case, in other words, is weaker now than it was when Magistrate Cole considered the issue of bond.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>Plaintiff, )<br>) CRIMINAL ACTION<br>v. ) NO. 2:12-CR-28-RWS<br>)<br>LARRY McDANIEL, )<br>)<br>Defendant. ) | |

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing PRE-HEARING MEMORANDUMIN SUPPORT OF RELEASE PENDING TRIAL with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all counsel of record.

This 17th day of September, 2012.

_____
DONALD F. SAMUEL