IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION


UNITED STATES OF AMERICA     :
:     CRIMINAL INDICTMENT
v.                         :     NO.: 2:12-CR-028-RWS-JCF
:
LARRY MCDANIEL          :


## REPORT AND RECOMMENDATION

This case is before the Court on Defendant McDaniel's Motion to Suppress (Doc. 77) and his Motion for Return of Seized Property Pursuant to Federal Rule of Criminal Procedure 41(g) (Doc. 78). Because government agents did not deliberately elicit the statement at issue in Defendant's motion to suppress, it is **RECOMMENDED** that Defendant's motion to suppress that statement be **DENIED**. Further, because the facts before the Court show that the Government does not currently possess the money Defendant alleges agents seized from him, it is **RECOMMENDED** that Defendant's motion for the return of property be **DENIED**.

## Background

Defendant McDaniel made his initial appearance in this Court on August 16, 2012, at which time the Court appointed counsel to represent him. (*See* Doc. 6).

1

On August 31, 2012, Magistrate Judge Susan S. Cole conducted a hearing on the Government's motion to detain Defendant and denied the Government's motion. (*See* Docs. 31, 34). After conducting a hearing on the Government's appeal of that decision, District Court Judge Richard W. Story affirmed it on September 18, 2012 (*see* Doc. 51). Defendant was eventually released on bond with conditions that, among other things, he "submit to supervision by and report for supervision to the . . . U.S. Pretrial Services"; he is "restricted to [his] residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities approved in advance by the pretrial services office or supervising officer"; and he must "submit to location monitoring as directed by the pretrial services office or supervising officer . . . ." (Doc. 56). In the meantime, on September 4, 2012, the Government filed an Indictment (Doc. 39), which charges Defendant McDaniel with obstructing and impeding an FBI investigation (Count One) and with possession of a firearm by a convicted felon (Count Two).

On October 30, 2012, Defendant filed a motion to suppress (Doc. 77), seeking to suppress a statement he purportedly made to Federal Bureau of Investigation ("FBI") Special Agent Mark Sewell on October 24, 2012, after Defendant had been indicted and was represented by counsel. Defendant also filed

a motion for return of property pursuant to FED. R. CRIM. P. 41(g) (Doc. 78), requesting that the Government return to him an amount of cash allegedly seized by the Government when agents arrested Defendant on August 16, 2012.

The Court conducted a hearing on both motions on December 10, 2012 (*see* Tr. 95), at which FBI Special Agents Joe Thompson and Mark Sewell testified about the alleged seizure of cash from Defendant's pants pocket during his August 16, 2012 arrest, and Agent Sewell and Hall County Sheriff's Office Deputy Gary Moore testified about Defendant's October 24, 2012 statement to Agent Sewell. A transcript of that hearing was filed on December 18, 2012. (Tr. 99).[1] After the hearing, Defendant filed the Declaration of Robert Smith, in support of his motion for return of property (Doc. 96), and the Government filed the Declaration of Special Agent Marcus Kirkland in response to that motion (Doc. 100).[2] The Government also filed post-hearing briefs in response to Defendant's motion to suppress and motion for return of seized property (Docs. 102, 103). Defendant filed post-hearing briefs in support of his motions (Docs. 107, 108), and the Government filed reply briefs on February 5, 2013 (Docs. 113, 114). Briefing is complete, and the undersigned now considers the merits of Defendant's motion.

---

[1] References to the hearing transcript are designated as "Tr. __."

[2] The Court permitted the parties to submit declarations after the hearing. (*See* Tr. 32).

## Discussion

### I.    Defendant's Motion to Suppress

####    A.    Facts Relevant to Defendant's Motion

On October 24, 2012, Agent Sewell and Deputy Moore, a Safe Streets Task Force member, were in the Hapeville area of Atlanta to conduct interviews.  (Tr. 36, 53, 55, 60).  Agent Sewell decided to confirm that Defendant McDaniel was at his residence and was "adhering to the bond conditions of not associating with Outlaw members or associates."  (Tr. 37, 55-56).  Agent Sewell was particularly concerned about Defendant's compliance with his bond conditions because he had previously been a fugitive for 10 years and placed on the United States Marshal's Top 15 fugitive list, which was an issue raised during Defendant's bond hearing. (Tr. 37).  Agent Sewell was also concerned about Defendant's motivation to flee given the possibility of a lengthy sentence if convicted.  (Tr. 37-38).  Sewell knew that Defendant was represented by counsel.  (Tr. 47).

At some time prior to that date, Agent Sewell had contacted Sallie Clark, a supervisor at the Gainesville Probation Office, to confirm Defendant's address, and he told her that he "would be in the area conducting surveillance on and off during the course of this investigation[.]"  (Tr. 38, 45).  Sewell did not inform personnel at

the Probation Office, Pretrial Services, or the United States Attorney's office that he was going to Defendant's address on October 24, 2012. (Tr. 38, 47).

Agent Sewell and Deputy Moore drove to Defendant's Lake Avenue address in Hapeville, and watched Defendant's residence for approximately 10 minutes. (Tr. 39, 56). They did not observe any cars coming or going; they saw one vehicle at the curb and ran the tag, but it "came back" to a woman they did not know whose address was listed as Canton, Georgia in Cherokee County. (Tr. 39-40). They did not see Defendant McDaniel or "any vehicles that Mr. McDaniel was known to drive," including motorcycles. (Tr. 39). In short, they did not "see anything that gave [Agent Sewell] a feeling that Mr. McDaniel was there on that day." (Tr. 39). They did see a woman standing on the front porch at one point, and then she went back inside the house. (Tr. 39-40, 56).

Agent Sewell and Deputy Moore then decided to confirm that Mr. McDaniel was at the residence, so they walked up to the house and knocked on the front door. (Tr. 40, 56). They knocked a few times, and then Defendant opened the door, exited the house, and closed the door behind him. (Tr. 40-41, 50, 56). Agent Sewell told Defendant that they were there to "verify his address," to make sure he was present either at his residence or at work as required by his bond conditions. (Tr. 41-42, 56-57). Defendant motioned for the agents to sit down on the front

porch, but the agents declined; it was not Agent Sewell's "intention to sit and have a conversation." (Tr. 41, 57). It was also not Agent Sewell's intention to interrogate Defendant about the charged offenses, and he did not ask Defendant any questions during their conversation. (Tr. 41-44, 60-62). In response to Agent Sewell's explanation of why they were there, Defendant said, "yeah, I'm here," and he "volunteered a little bit of information" about being laid off from his job, trying to find work, and receiving phone calls from probation about his ankle monitor alarm going off due to alleged irregularities because of the proximity of the house to Hartsfield-Jackson Atlanta International Airport. (Tr. 42, 56-58). Agent Sewell and/or Deputy Moore said, "All right. Well, that's it," and then left the porch and started walking down Defendant's driveway. (Tr. 43, 58-59). As they were walking down the driveway, Defendant said, "Hey, Mark. Can I talk to you for a second?" and "waved him over." (Tr. 43, 59, 61). Agent Sewell walked toward Defendant, who was still on the porch, and Defendant said "Hey, just let you know that – I thought," or "we thought Mark Sewall [sic] and Brad Smith was the same person," and that "these misunderstandings of [Agent Sewell's] name [were] nothing personal, there was no agenda," or words to that effect. (Tr. 43-44, 59). Sewell responded, "Hey, you know, I gotcha. No problem. I'm aware of the

confusion," and then walked away. (Tr. 59, 62).[3] Defendant made no further statement. (Tr. 60).

**B.** <u>Analysis</u>

Defendant argues that Agent Sewell violated Defendant's Sixth Amendment rights by going to his residence and "initiat[ing] a conversation with him regarding this case," even though Agent Sewell knew that Defendant had been indicted and was represented by counsel. (Doc. 107, Def. Br. at 1-2, 7).

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "The Sixth Amendment right to counsel is triggered at or after the time that judicial proceedings have been initiated, whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Fellers v. United States*, 540 U.S. 519, 523 (2004) (internal quotations omitted). "A Sixth Amendment violation occurs when (1) government

---

[3] As has been recounted elsewhere, Brad Smith is an informant who participated in the Government's investigation which culminated in the charges in this and other related cases. (*See* Doc. 136 in *United States v. Honeycutt, et al.*, Criminal Action No. 2:12-CR-0022-RWS-JCF, at 4). At the December 10, 2012 hearing, the Government asserted that Defendant's "statement is consistent with the Government's theory about Mr. McDaniel's obstruction of justice in this case," that it is "consistent with what the Government plans to prove about Mr. McDaniel's knowledge of an FBI investigation when he obstructed the investigation." (Tr. 65).

agents (2) deliberately elicit incriminating statements from an accused after he has been indicted, outside the presence of counsel, and (3) in the absence of any waiver of his Sixth Amendment rights." *United States v. Richitelli*, 420 Fed. Appx. 861, 867 (11th Cir. 2011) (unpublished decision) (citing *Fellers*, 540 U.S. at 523-25). Defendant "has the burden of establishing a violation of this Sixth Amendment right to counsel." *United States v. Silva*, No. 1:09-CR-361-RWS/AJB, 2010 U.S. Dist. LEXIS 140186, at *24 (N.D. Ga. Nov. 1, 2010), *adopted by* 2011 U.S. Dist. LEXIS 5796 (N.D. Ga. Jan. 20, 2011).

Defendant asserts that "a government agent deliberately elicited responses by questioning Mr. McDaniel regarding his bond conditions," and that "[s]uch questioning and veiled intimidation by the two agents violated [his] Sixth Amendment protections." (Doc. 107, Def. Br. at 7). The undersigned disagrees, and finds that Agent Sewell and Deputy Moore did not deliberately elicit the allegedly incriminating statement from Defendant.

To show that a government agent violated his Sixth Amendment rights, Defendant "must demonstrate that the police . . . took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann v.* Wilson, 477 U.S. 436, 459 (1986). Although Agent Sewell and Deputy Moore went to Defendant's house, after he had been indicted and outside

the presence of counsel, to confirm that he was complying with bond conditions,[4] they did not question him about the charged offenses, or make any statement designed to elicit a statement about the offenses. *See Richitelli*, 420 Fed. Appx. at 867 (finding that detective took no action to deliberately elicit incriminating statements from defendant where, during a telephone conversation with the defendant, the detective "did not directly question Richitelli about his involvement in the attempted robbery and did not play on Richitelli's emotions to elicit incriminating statements," and "did not engage in a prolonged discussion of the details of the offenses or Richitelli's involvement in them").

The facts in this case are distinguishable from those in *Fellers*, cited by Defendant for the proposition that the agents' contact with Defendant was "forbidden under this country's jurisprudence." (Doc. 107, Def. Br. at 7). In *Fellers*, the Court found that the officers had deliberately elicited information from the defendant in violation of his Sixth Amendment rights where the officers went to the defendant's home after he was indicted for conspiracy to distribute

---

[4] Agent Sewell's concerns about Defendant's compliance with his bond conditions were not unreasonable given the Government's proffer at Defendant's detention hearing regarding Defendant's previous history as a fugitive. (*See* Tr. 37). However, the undersigned emphasizes that U.S. Pretrial Services was responsible for supervising Defendant's compliance with the terms of his release (*see* Doc. 56), and questions why Agent Sewell did not share his concerns with Pretrial Services, or coordinate with Pretrial Services to confirm that Defendant was complying with the terms of his release.

methamphetamine and told the defendant that "they had come to discuss his involvement in methamphetamine distribution," thus eliciting the defendant's inculpatory statements, "outside the presence of counsel, and in the absence of any waiver of [his] Sixth Amendment rights[.]" 540 U.S. at 521, 524-25. Here, there is no evidence that Agent Sewell or Deputy Moore told Defendant that they were there to discuss the charged offenses, made any statement about the charged offenses, or made any other comment designed to elicit information from Defendant about the charged offenses. Instead, Agent Sewell told Defendant that he was there to make sure Defendant was present at his residence or at work as required by his bond conditions. That statement does not appear designed to elicit an incriminating statement, nor did it do so. In response to Agent Sewell's statement, Defendant made non-incriminating statements about his compliance with his bond conditions. The conversation between the agents and Defendant then concluded, and the agents walked away. It was only after the agents were walking away from Defendant that *Defendant* summoned Agent Sewell back to the porch and volunteered the allegedly incriminating statement at issue, without any statement, question, or action on the part of the agents designed to deliberately elicit an incriminating statement.

Accordingly, it is **RECOMMENDED** that Defendant's motion to suppress his October 24, 2012 statement (Doc. 77) be **DENIED**.

## II. Defendant's Motion for Return of Property

### A. Facts Relevant to Defendant's Motion

On August 16, 2012, Special Agent Joe Thompson of the FBI participated in the arrest of Defendant McDaniel at the Outlaw Motorcycle clubhouse in Atlanta, Georgia. (Tr. 11-12). When Agent Thompson entered the clubhouse, Defendant, who was undressed, exited his bedroom. (Tr. 12-13). Agent Thompson handcuffed Defendant, asked him where his pants were, and then instructed an agent to retrieve Defendant's pants from his bedroom. (Tr. 13). The agent who retrieved the pants checked the pants pockets and found a wallet and money and removed those items before allowing Defendant to put on the pants. (Tr. 13). After the tactical team completed Defendant's arrest and secured the premises, an evidence response team arrived to search the premises pursuant to a search warrant, take photographs, and secure any items to be seized. (Tr. 13-15; *see also* Kirkland Decl., Doc. 100, ¶ 2). Agent Thompson advised Special Agent Marcus Kirkland, an agent on the evidence response team, to count the money taken from Defendant's pants pocket—$706.00—because Agent Sewell, the case agent, instructed Agent Thompson not to take any money from the residence pursuant to

instructions from the United States Attorney's Office.  (Tr. 14; Kirkland Decl., ¶¶ 2-4).  Agent Kirkland did seize Defendant's wallet, and the wallet was entered on the log of evidence that was taken from the premises.  (Kirkland Decl., ¶ 5).[5] During the search of the clubhouse, agents also found cash in a couple of safes; that money was not seized.  (Tr. 13-14, 21).   Agent Kirkland did not take the $706.00 found in Defendant's pants pocket, and when the evidence response team left the clubhouse, that money remained on a dresser in Defendant's bedroom.  (Tr. 15; Kirkland Decl., ¶ 5).[6]

No one else was present at the clubhouse, other than law enforcement agents, during Defendant's arrest and the subsequent search of the clubhouse.  (Tr. 15-16).  Agent Thompson asked Defendant if he could recommend someone that could take possession of the premises, and Defendant indicated a friend named Robert Smith, known as "Smitty," could do so, and he gave Agent Thompson Mr. Smith's telephone number.  (Tr. 16, 22; *see also* Smith Decl., Doc. 96-1).  Agent Thompson called Mr. Smith, who is a part owner of the property, explained the situation, and told him that Defendant had asked if Mr. Smith could come to the

---

[5] The Government later returned the wallet to Defendant, along with a motorcycle that agents had seized.  (Tr. 29, 47-48).

[6] The evidence response team photographed the wallet and the cash on the dresser (*see* Def. Exs. 1, 2), but it does not appear that the agents photographed the cash by itself after the wallet was seized.  (*See* Tr. 29).

property to take possession of it.  (Tr. 16, 22; Smith Decl., ¶¶ 3-4).  When Mr. Smith arrived, "the property was relinquished to him at Mr. McDaniel's request." (Tr. 16).  Mr. Smith testified that when he arrived at the property, nobody told him about money being at the location, he did not go into Defendant's bedroom, he did not see any money at the clubhouse, and he has "no knowledge of any money, cash or otherwise, being at the property when [he] arrived, or when [he] left."  (Smith Decl., ¶¶ 5-7).[7]

## B. <u>Analysis</u>

Rule 41(g), (formerly FED. R. CRIM. P. 41(e)), provides in relevant part that "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return."  FED. R. CRIM. P. 41(g)  "The government is not obligated to return property that it no longer possesses, but it must provide some evidentiary support for its claim that it no longer has possession of the property."  *United States v. Garcon*, 406 Fed. Appx. 366, 369 (11th Cir. 2010) (unpublished decision).

In this case, the Government concedes that FBI agents removed $706 in cash from Defendant's pants pocket during his arrest.  The evidence shows the agents counted the money, photographed it along with a wallet that was seized, and placed

---

[7] Because agents broke down the door to the clubhouse when they arrived to execute the arrest warrant, Mr. Smith repaired the door.  (Tr. 23; Smith Decl., ¶ 8).

the money on a dresser in Defendant's bedroom; however, they did not remove the money from the premises. Defendant introduced no evidence to the contrary, nor did he present evidence, by declaration or otherwise, that the money did not remain where the agents left it until such time as the premises were turned over to the person designated by Defendant.[8] The Court finds that, even if Government agents "seized" Defendant's cash when they removed it from his pants pocket, the record contains evidentiary support for a conclusion that the agents left the money in Defendant's bedroom and did not remove the cash from the subject premises. Therefore, the Government does not possess the money and is not obligated to return it pursuant to FED. R. CRIM. P. 41(g). *See, e.g.*, *Glover v. United States*, No. CR5:05-020, 2008 U.S. Dist. LEXIS 78691, at *2 (S.D. Ga. Oct. 8, 2008) (" 'The government cannot return property it does not possess, and a motion for the return of illegally-held property must be denied if the government does not possess the property.' " (quoting Charles Allen Wright, Nancy J. King, & Susan R. Klein, 3A *Federal Practice and Procedure* § 673 (3d ed. 2008)); *see also United States v. Castrejon*, No. 08-00094-KD, 2010 U.S. Dist. LEXIS 47807, at *2-6 (S.D. Ala.

---

[8] Mr. Smith testified that he did not go into Defendant's bedroom, and has "no knowledge of any money, cash or otherwise, being at the property when [he] arrived, or when [he] left." (Smith Decl., ¶¶ 6, 9). Thus, it is entirely possible that the money was removed from the Defendant's bedroom *after* the premises were turned over to Mr. Smith.

May 14, 2010) (denying defendant's motion to return his wallet because the wallet was left in defendant's car, which was given to a person who claimed to be defendant's family member after defendant's arrest, and therefore, the Government was not in possession of the wallet); *United States v. Cineus*, No. 05-60050-CR-JORDAN/TORRES, 2006 U.S. Dist. LEXIS 81993, at *1-4 (S.D. Fla. Nov. 9, 2006) (denying defendant's motion to return several pieces of jewelry because the the Government denied seizing certain pieces and represented that others had been returned to a person with "apparent authority to act as Defendant's agent at the time the government gave him Defendant's property," and therefore, the Government had "adequately accounted for its obligations," notwithstanding the defendant's claim that he had not received all of the jewelry he claimed agents had seized).

Furthermore, to the extent that Defendant requests that the Court direct the Government to reimburse Defendant for the value of his cash based on the agents' alleged failure to secure the money (*see* Doc. 108, Def. Br. at 3-4), the Court cannot grant such relief because sovereign immunity protects the Government from money damages sought under Rule 41(g). *United States v. Potes Ramirez*, 260 F.3d 1310, 1315-16 (11th Cir. 2001); *see also Cineus*, 2006 U.S. Dist. LEXIS 81993, at *4 n.2 (explaining that, even if the Government had not returned, or had

lost, some of the seized jewelry, "[t]here is, of course, no money damage remedy available against the government under [Rule 41(g)] based on the government's sovereign immunity").

Under the governing authority set forth above, and in light of the facts as developed in the record, Rule 41 does not require the Government to "replace" the missing money. Accordingly, it is **RECOMMENDED** that Defendant's motion for return of seized property pursuant to Rule 41(g) (Doc. 78) be **DENIED**.

### Summary

It is **RECOMMENDED** that Defendant McDaniel's Motion to Suppress (Doc. 77) and Motion for Return of Seized Property Pursuant to Federal Rule of Criminal Procedure 41(g) be **DENIED**.

**IT IS SO REPORTED AND RECOMMENDED** this <u>12th</u> day of February, 2013.

_____
J. CLAY FULLER
United States Magistrate Judge